2009 WY 77

**Richard G. BLOOMER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–08–0139.

Supreme Court of Wyoming.

June 12, 2009.

---

4. The district court found that Mr. Duke was a qualified offender. The State does not contest this finding.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Richard G. Bloomer (Bloomer), was convicted of two counts of possession of methamphetamine with intent to deliver. He challenges those convictions on the basis that the district court erred in denying his motion to quash the jury panel because the method used to select that panel violated principles associated with selecting a jury that represents a fair cross section of the community. In addition, he asserts that the district court refused to consider probation for Bloomer in violation of established legal principles. We will affirm.

### ISSUES

[¶ 2] Bloomer raises these issues:

I. Did the trial court err in denying [Bloomer's] motion to quash the jury panel?

II. Did the trial court err in refusing to consider probation for [Bloomer]?

The State presents the issues in these terms:

I. Did the clerk of court violate either Wyo. Stat. Ann. § 1–11–129 or the Sixth Amendment of the United States Constitution by drawing jurors in alphabetical order from a random list prepared by Wyoming's Secretary of State?

II. Is [Bloomer] entitled to a new sentencing as a consequence of the trial judge's statement—at an abortive change-of-plea hearing—that he would not consider probation if [Bloomer] went to trial and was convicted by a jury?

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Eric Johnson, Faculty Director, Prosecution Assistance Program; Eric K. Thompson, Student Director; and Curtis H. Cheney, Student Intern. Argument by Mr. Cheney.

### FACTS AND PROCEEDINGS

[¶ 3] The underlying facts of Bloomer's crimes are not of any special significance to the issues raised in this appeal and so we will not recite them in detail. It suffices to note that he was selling methamphetamine as a dealer. At his arraignment on August 16, 2004, Bloomer entered pleas of not guilty to both charges. Bloomer absconded to Montana in November of 2004, and so his December 13, 2004 trial date was vacated. Bloomer

was imprisoned in Montana on other charges but was returned to Wyoming in the summer of 2007 under a detainer. Bloomer's trial was set for January 17, 2008, but on October 24, 2007, Bloomer requested a "Change of Plea and Sentencing Hearing," and that proceeding was scheduled for December 17, 2007. When he appeared at that hearing, Bloomer disclosed that he no longer wanted to enter guilty pleas. It was in response to this development that the district court stated:

> I want to tell you something, you certainly have a right to have a jury trial, but as of today there will be no plea agreements. We go to jury trial. If you are found guilty on either one of the counts, there will be no request for any type of probation.

This occurrence forms the basis for Bloomer's second issue.

[¶ 4] On January 28, 2008, the first day of Bloomer's trial, Bloomer filed a "Motion to Quash Jury Panel." The motion was based upon the district court clerk's policy of selecting jurors from the master list in alphabetical order, rather than in a random selection process. Bloomer posits that, in combination, Wyo. Const. art. 1, § 7 ("Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."); art. 1 § 9 ("The right of trial by jury shall remain inviolate in criminal cases."); and art. 1, § 10 ( . . . "[T]he accused shall have the right . . . to a speedy trial by an impartial jury[.]"), mandate that the jury selection process used in Park County is in violation of those core constitutional principles. In addition, he asserts that the jury selection process used by the clerk of the district court violates the Sixth Amendment and the Due Process Clause of the United States Constitution (*Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

[¶ 5] Wyo. Stat. Ann. § 1–11–109 (LexisNexis 2007) provides:

> (a) The clerk shall shake the box containing the names of the regular jurors so as to mix the ballots therein as well as

possible. He shall then draw from the box as many ballots as are ordered by the court.

> (b) The name on each ballot drawn shall be entered in the minutes of the court.

> (c) If the name of any person is drawn who is not competent to serve as a trial juror, and the incompetence shall be made to appear to the satisfaction of the court, the name of the person shall be stricken from the jury list, the ballot containing the name shall be destroyed, and such fact shall be entered in the minutes of the court.

> (d) When the necessary number of jurors has been drawn, the clerk shall make and certify a list of the names drawn. The certificate shall state:

> (i) The date of the court order for the drawing;

> (ii) The date of the drawing;

> (iii) The number of jurors drawn;

> (iv) The names and addresses of the competent jurors; and

> (v) The time and place where the jurors are required to appear.

> (e) The jurors on the certified list shall be summoned to appear.

[¶ 6] Wyo. Stat. Ann. § 1–11–129 (LexisNexis 2007) provides:

> The procedures for compiling and maintaining of jury lists, jury ballots and jury boxes, and for drawing jurors, may be modified by the court to permit the compilation and maintenance of jury lists and ballots and for the drawing of jurors by any manual, mechanical, electronic or other means calculated to insure the integrity of the system and a random selection process.

[¶ 7] The district court took testimony from the district court clerk who described her process in detail, including that it was adopted by order of the presiding judge. The district court ruled:

> [T]hat process does ensure that there is a fair representation of those people of the community to ensure a fair and adequate trial for the Defendant in this matter.

Therefore, the Court is going to decline to quash the jury panel.

## DISCUSSION

### Make–Up of Jury Panel

[¶ 8] Although the facts which were brought out in the district court clerk's testimony are important in resolving this issue, at bottom this is a question of statutory construction which we review *de novo:*

> In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in pari materia and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with [the] legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in pari materia. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. We must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation. Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions.

*Muller v. Jackson Hole Mountain Resort,* 2006 WY 100, ¶ 9, 139 P.3d 1162, 1166 (Wyo. 2006) (quoting *Sponsel v. Park County,* 2006 WY 6, ¶ 9, 126 P.3d 105, 108). Moreover, a party's claim asserting an infringement of the right to due process is reviewed *de novo. Reece v. State,* 2008 WY 121, ¶ 8, 193 P.3d 274, 276 (Wyo.2008).

[¶ 9] The clerk of the district court described her methodology in detail. Before each term of court, she receives a randomly selected list of 350 jurors' names from the Wyoming Secretary of State. The names are drawn from voter registration lists and driver's license records. When a jury trial is scheduled, the district court clerk selects a number of jurors as recommended by the district judge for a particular trial. For various reasons (such as moving out of the district, over age 72, health problems, etc.) some jurors are deleted from the list. Thereafter, for the first jury drawn from a new master list, the clerk selects the number of names needed for the immediate jury panel. In this case, that was 53 names. The names were taken from the list in alphabetical order, rather than by a random selection from all jurors on the list. Those names were then randomly drawn to select the jury in the instant case. This is done largely for the convenience of jurors. That is, rather than drawing from the entire list each time a panel is required, names are taken from the list in alphabetical order. By this means the same jurors are not drawn over and over. Once an alphabetical list is given to the district court as a jury panel, those same names will not be subject to being called again, unless the clerk has gone through the entire list and it is necessary to go back to the beginning of the list once again. This methodology has been in use in Park County for over 15 years. In the district court clerk's view, § 1–11–129 allows each district to use a method that best suits its needs. For example, for the first trial during a term of court, the jurors will all be from the beginning of the alphabetized list. In the instance of this particular trial, all jurors' names began with the letters "H" through "P."

[¶ 10] This issue has arisen before in other jurisdictions. For instance, in *State v. Azure,* 2005 MT 328, ¶¶ 14–17, 125 P.3d 1116, 1118–20 (Mont.2005) it was held:

> Azure's jury venire was compiled by combining three separate jury panels that had been randomly selected by computer from the list of Cascade County registered voters. These panels were called for trials scheduled to occur around the same time as Azure's trial. When these other trials did not take place, the jury panels were held over and ultimately assigned to Azure's trial. Panels one and two each

originally consisted of seventy persons. Panel three originally consisted of thirty-five persons. Prior to being assigned to Azure's trial, these panels were reduced to forty-six, forty-seven, and twenty-four persons respectively as a result of some jurors being excused by the clerk's office or the judge for legitimate reasons. Additionally, ten people were eliminated for failure to contact the clerk after the summons was mailed to them and the clerk was subsequently unable to reach them.

Panel one was initially assigned to Azure's trial. However, the District Court notified the clerk several days before the trial that it wanted *at least* eighty prospective jurors in this case. To accommodate this request, the clerk's office added the twenty-four names from panel three to the forty-six names on panel one. This created a pool of seventy people. The clerk then added the first twenty-one names from panel two. However, because panel two had previously been alphabetized, the selected surnames began with the letters A through K, and the names beginning with the remaining letters of the alphabet were eliminated. Subsequently, one person from panel two was excused, leaving the District Court with ninety potential jurors from which to choose. These ninety names were placed in a box for additional random selection, and the first twenty-seven names selected comprised the venire for the jury and one alternate.

Azure's complaint on appeal arises from the manner in which panel two was split. He maintains that it was error to alphabetize this list and then select only the first twenty-one persons based upon the first letter of their last names. He posits that once the list was put in alphabetical order and then not used in its entirety, it ceased

to be random. He further asserts that when this list was combined with the other panels, the overall jury pool was tainted, he was denied a fair cross-section jury panel, and he is entitled to a new trial.

Section 3–15–503(1)(b), MCA (1995), upon which Azure relies, states:

> If the drawing of jurors is conducted by means of a computerized database, it must be conducted by use of a computerized random *selection process* that the judges of the district court of the county have approved in writing as satisfactorily fulfilling the requirements for the drawing of trial juries. [Emphasis added.]

Azure complains his jury panel was not "randomly" selected. Using the ordinary meaning of the term "random," *i.e.*, lacking a specific plan or pattern,[FN1] it could be argued that once the list was alphabetized, it was no longer random. However, to prevail, Azure must prove that the *selection process* was not random. This he has failed to do. Mere alphabetization of a randomly selected list of names and elimination of some of those names based exclusively on where they fall in the alphabet does not taint the random selection process. As a result, we conclude Azure's jury selection process did not violate § 3–15–503(1)(b), MCA (1995).[1]

---

FN1. The American Heritage Dictionary of the English Language 1448 (4th ed.2000).

Without substantive analysis, Azure relies on *State v. Taylor* (1975), 168 Mont. 142, 542 P.2d 100, and *Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, in arguing that the alphabetization and subsequent bifurcation of one jury panel "systematically excluded an

---

1. Montana Code Ann. § 3–15–503 (1995) states:

 (1) (a) If the drawing of jurors is conducted by means of a jury box, the jury commissioner shall place the box on a rod so that it may readily revolve. The box must be revolved a sufficient number of times to ensure that the numbered slips in it become thoroughly mixed. The jury commissioner shall then draw from the box, one at a time, as many of the numbered slips as are ordered by the court.

 (b) If the drawing of jurors is conducted by means of a computerized database, it must be

conducted by use of a computerized random selection process that the judges of the district court of the county have approved in writing as satisfactorily fulfilling the requirements for the drawing of trial juries.

 (2) A record of the drawing must be entered in the minutes of the court. It must show the names of the jurors corresponding to the numbers drawn from the jury box or the names drawn by means of the computerized random selection process.

identifiable class of citizens." Our review of these cases leads us to share Justice Harrison's observation in *State v. Taylor,* "We have no disagreement with the case authority cited by defendant nor the law established by that authority, however, the case authority cited is not applicable to the instant case." While these cases stand for the proposition that a systematic exclusion of *an identifiable class of citizens* violates the requirement that the jury be a fair cross-section of the community, Azure failed to establish that the persons eliminated from the alphabetical list were eliminated based upon their "race, color, sex, culture, social origin or condition, or political or religious ideas." *State v. Taylor,* 168 Mont. at 144, 542 P.2d at 101. Moreover, Azure failed to show any prejudice against him or injury affecting his right to an impartial jury resulting from the alleged discriminatory selection of his jury. *State v. Taylor,* 168 Mont. at 148, 542 P.2d at 103.

The elimination of panel members from a venire based exclusively on the first letter of the person's last name is not a systematic exclusion of a distinctive, identifiable class of the community. There was no discernible gender, ethnic, or other suspect grouping that occurred when certain names from panel two were used while others were not. Simply put, the twenty-six people from panel two who were not selected for Azure's jury pool do not comprise an "identifiable class of citizens," and the alphabetization of panel two and limited selection therefrom did not run afoul of the statute or applicable case law.

Lastly, as noted by the District Court in its Order, the jury selection process in the case before us is distinguishable from that utilized in *State v. LaMere,* 2000 MT 45, 298 Mont. 358, 2 P.3d 204. In *LaMere,* the clerk notified prospective jurors of jury duty by telephone instead of through the mail. Noting that this method necessarily eliminated any person who did not have a telephone, or allowed persons with telephones to "excuse himself or herself from possible jury duty simply by failing to return the clerk's phone call," the Court held that the telephone summoning method was a "substantial failure to comply" with relevant jury selection statutes, and materially undermined the purpose of these selection statutes to provide for random selection of jurors on the basis of objective criteria. *LaMere,* ¶¶ 73 and 75. We vacated LaMere's conviction and remanded the matter for a new trial. *LaMere,* ¶ 76. We conclude that Azure has not established that the jury summoning method employed by the clerk in this case was a "substantial failure to comply" with the statutes governing the procurement of a trial jury.

[¶ 11] A different result was reached in a West Virginia case that was based on a statute different from Montana's and Wyoming's:

The petitioner herein, Thomas Stanley, Esq., requests this Court to issue a writ of prohibition against the respondent herein, Virginia Sine, Circuit Clerk of Berkeley County.[FN1] Specifically, Petitioner Stanley seeks relief to prohibit Clerk Sine from selecting prospective jurors in sequential alphabetical order and to require her to comply with the random jury selection criteria set forth in W.Va.Code §§ 52–1–6 (1993) (Repl.Vol.2000) and 52–1–7 (1993) (Repl.Vol.2000). Upon a review of the parties' arguments, supporting materials, and pertinent authorities, we grant as moulded the requested writ of prohibition.

---

FN1. We agree with Clerk Sine's assertion that the circuit judge of Berkeley County should have been made a party to this proceeding. Given the urgency of this matter based upon its far-reaching impact upon all cases currently pending in that jurisdiction, however, we will consider this case with respect to the parties presently before the Court.

### I.

### FACTUAL AND PROCEDURAL HISTORY

The petitioner herein, Thomas Stanley, Esq., is an attorney with the Public Defender Corporation in Martinsburg, West Virginia. . . . During his representation of clients in the Circuit Court of Berkeley County, he learned that the respondent herein, Virginia Sine, Circuit Clerk of Berkeley County, selects prospective ju-

rors in sequential alphabetical order from that term of court's jury panel list. Designation of the jury panel list begins with a *source list* consisting of a consolidated listing of licensed drivers and registered voters in Berkeley County, in accordance with the requirements of W. Va.Code § 52–1–5 (1993) (Repl.Vol.2000).[FN3] A *master list* is then created every two years by a computer-generated random drawing of 10,000 names from the source list, pursuant to W. Va.Code § 52–1–6(b) (1993) (Repl.Vol. 2000). The *prospective juror list* is then compiled each month through a computer-generated random drawing of 300 names from the master list, as required by W. Va.Code § 52–1–7(a) (1993) (Repl.Vol. 2000).

---

FN3. Although not referenced in Clerk Sine's recitation of facts, persons comprising the source list may also include those "who have filed a state personal income tax return for the preceding tax year[.]" W. Va.Code § 52–1–5(a)(1) (1993) (Repl.Vol.2000).

Upon selection as a member of the prospective juror list, all prospective jurors are sent a questionnaire. After disqualifying jurors who indicate an inability to serve due to non-residence, age, death, or other legal disability, the remaining members of the prospective juror list ultimately comprise the *jury box*.[FN4] Because the source list and master list are arranged alphabetically, the computerized numbering of the members of the prospective juror list also, coincidentally, is arranged alphabetically. Rather than selecting prospective jurors according to the key number system delineated in W. Va.Code § 52–1–6(c), by which a key number is derived and used to select members of the jury box,[FN5] the clerk had been directed to start at the beginning of the jury box list and to select prospective jurors in sequential alphabetical order until the desired number of jurors had been attained. It is the selection of prospective jurors pursuant to this sequential alphabetical order to which Petitioner Stanley objects in this proceeding.

---

FN4. More specifically, W. Va.Code § 52–1–3(7) (1988) (Repl.Vol.2000) defines a "jury box" as "any physical, nonelectronic device in which

are placed names or identifying numbers of prospective jurors taken from the master list and from which names are drawn at random for jury panels." *Cf.* W. Va.Code § 52–1–3(6) (defining "[j]ury wheel" as "any electronic system in which are located names or identifying numbers of prospective jurors taken from the master list and from which names are drawn at random for jury panels").

FN5. W.Va.Code § 52–1–6(c) (1993) (Repl.Vol. 2000) describes the key number system as follows:

The names or identifying numbers of prospective jurors to be placed in the jury wheel or jury box shall be selected by the clerk at random from the master list in the following manner: The total number of names on the master list shall be divided by the number of names to be placed in or added to the jury wheel or jury box and the whole number next greater than the quotient shall be the "key number", except that the key number shall never be less than two. A "starting number" for making the selection shall then be determined by a random method from the numbers from one to the key number, both inclusive. The required number of names shall then be selected from the master list by taking in order the first name on the master list corresponding to the starting number and then successively the names appearing in the master list at intervals equal to the key number, recommencing if necessary at the start of the list until the required number of names has been selected. Upon recommencing at the start of the list, or if additional names are subsequently to be selected for the jury wheel or jury box, names previously selected from the master list shall be disregarded in selecting the additional names. The clerk is not required to, but may, use an electronic or mechanical system or device in carrying out its duties. (For example, assume a county with a master list of eight thousand nine hundred eighty names, a population of less than fifteen thousand and a desired jury box or wheel containing two hundred names. Eight thousand nine hundred eighty names divided by two hundred is forty-four and nine-tenths percent. The next

whole number is forty-five. The clerk would take every forty-fifth name on the list, using a random starting number between one and forty-five.)

According to Clerk Sine, all of the jury panels seated in Berkeley County, including those for circuit court, family court, magistrate court, and Martinsburg Municipal Court, are selected in this manner. Petitioner Stanley suggests that the proper method for selecting prospective jurors is enumerated in W. Va.Code § 52–1–7 which requires that the names of prospective jurors be drawn from a properly comprised jury box to ensure their randomness.

Upon Petitioner Stanley's questioning of Clerk Sine as to the origins of the current method of sequential alphabetical selection, she indicated that she had been instructed to proceed in this manner by a Berkeley County circuit judge in approximately 1998. This directive was occasioned by several jurors' complaints that they could not access the designated telephone number to ascertain whether they were required to report for jury duty. In so ruling, the circuit judge had hoped to simplify the manner in which prospective jurors were notified as to whether or not their appearance would be required. Respondent Sine concedes that this directive was made on the record in open court, and was not memorialized by a written administrative or judicial order. Because Clerk Sine indicated that she intends to continue selecting prospective jurors in sequential alphabetical order until a judicial officer directs her to do otherwise, Petitioner Stanley filed the instant writ of prohibition to challenge the propriety of this practice.

. . . .

## III.

### DISCUSSION

The sole issue presented for resolution by this extraordinary proceeding is whether the statutory law delineating the manner in which prospective jurors should be selected permits prospective jurors to be selected in sequential alphabetical order.

Petitioner Stanley contends that the present method of selecting prospective jurors in sequential alphabetical order is not sufficiently random to comply with the governing common law and statutory requirements mandating the random selection of prospective jurors. *Citing* W. Va.Code § 52–1–1, *et seq.; Toothman v. Brescoach,* 195 W.Va. 409, 465 S.E.2d 866 (1995) (per curiam) (recognizing importance of random jury selection (citing *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975))); *Bennett v. Warner,* 179 W.Va. 742, 372 S.E.2d 920 (1988) (observing that random selection of jurors is important public policy recognized by Legislature); *State v. Nuckols,* 152 W.Va. 736, 166 S.E.2d 3 (1968) (finding that same random selection procedures for grand jury panels apply to petit jury panels). In short, Stanley argues that the failure to randomly select prospective jurors unconstitutionally violates a litigant's right to a fair and unbiased jury guaranteed by the Sixth Amendment to the United States Constitution and Article 3, § 14 of the West Virginia Constitution.

Clerk Sine first questions the propriety of the parties to this extraordinary proceeding. As she is subject to the direction and control of the judge or chief circuit judge of the circuit in which she serves, Clerk Sine suggests that the circuit judge or chief circuit judge of Berkeley County should have been joined as a party to this proceeding. *Citing* W. Va.Code §§ 52–1–7(a) (1993) (Repl.Vol.2000) and 52–1–9(a) (1986) (Repl.Vol.2000); *Rutledge v. Workman,* 175 W.Va. 375, 332 S.E.2d 831 (1985). As to the merits of this case, Clerk Sine denies that the current method of selecting prospective jurors is improper. Rather, she contends that she has substantially complied with the pertinent authorities delineating the procedure to be followed to ensure randomness. *Citing* W. Va.Code § 52–1–15 (1993) (Repl.Vol.2000); *Bennett v. Warner,* 179 W.Va. 742, 372 S.E.2d 920 (1988); *State v. Nuckols,* 152 W.Va. 736, 166 S.E.2d 3 (1968). Clerk Sine further suggests that the appropriate remedy to address Petitioner Stanley's complaint is not through a writ of prohibition but

through the statutory provision which permits him to raise the propriety of the jury selection procedures in advance of swearing the petit jury for a given case. *Citing* W. Va.Code §§ 52–1–15(a, c).

At the outset, we wish to address the propriety of hearing this matter in the context of a prohibition proceeding. Pursuant to the governing statute, W. Va.Code § 52–1–15(c) (1993) (Repl.Vol.2000), the procedures described therein are the "exclusive means" by which a person may challenge the propriety of the jury selection process in a given case.[FN6] *Cf.* Syl. pt. 2, *State v. Hankish*, 147 W.Va. 123, 126 S.E.2d 42 (1962) (holding, prior to enactment of W. Va.Code § 52–1–15 in 1986, that "[t]he proper method of challenging, before the trial of a case, alleged irregularities in the selection, drawing, or impaneling of jurors, is by plea in abatement"); *State v. Nuckols*, 152 W.Va. 736, 742, 166 S.E.2d 3, 8 (1968) (same). Despite this statutory directive, the instant case falls within that group of cases we previously have identified as "really extraordinary causes," *State ex rel. United States Fid. & Guar. Co. v. Canady*, 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995) (internal quotations and citations omitted), to which the extraordinary remedy of prohibitory relief applies. *See also State ex rel. Allen v. Bedell*, 193 W.Va. 32, 37, 454 S.E.2d 77, 82 (1994) (Cleckley, J., concurring) ("[W]rits of prohibition . . . provide a drastic remedy to be invoked only in extraordinary situations."); *McConiha v. Guthrie*, 21 W.Va. 134, 140 (1882) ("Prohibition . . . . issues only in cases of extreme necessity[.]").

FN6. In its entirety, W. Va.Code § 52–1–15 (1993) (Repl.Vol.2000) provides

(a) Within seven days after the moving party discovers, or by the exercise of due diligence could have discovered, the grounds therefor, and in any event before the petit jury is sworn to try the case, a party may move to stay the proceedings, quash the indictment or move for other relief as may be appropriate under the circumstances or the nature of the case. The motion shall set forth the facts which support the party's contention that there has been a substantial failure to comply with this article in selecting the jury.

(b) Upon motion filed under subsection (a) of this section containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this article, the moving party is entitled to present, in support of the motion, the testimony of the clerk, any relevant records and papers not public or otherwise available used by the clerk, and any other relevant evidence. The clerk may identify the lists utilized in compiling the master list, but may not be required to divulge the contents of such lists. If the court determines that in selecting a jury there has been a substantial failure to comply with this article, the court shall stay the proceedings pending the selection of the jury in conformity with this article, quash an indictment or grant such other relief as the court may deem appropriate.

(c) In the absence of fraud, the procedures prescribed by this section are the exclusive means by which a person accused of a crime, the state or a party in a civil case, may challenge a jury on the ground that the jury was not selected in conformity with this article.

As noted above, when deciding whether a particular case is appropriate for the issuance of a writ of prohibition, we consider whether other remedies are available and, if they are, whether they will adequately afford the petitioner relief, as well as the likelihood that a trial of the underlying matter "will be completely reversed if the error is not corrected in advance." Syl. pt. 1, in part, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744. *Accord* Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12. *See also Dankmer v. City Ice & Fuel Co.*, 121 W.Va. 752, 760, 6 S.E.2d 771, 775 (1939) ("The writ of prohibition should not be used except in cases where relief is not available through ordinary channels of practice."); *McConiha v. Guthrie*, 21 W.Va. at 140 ("Prohibition, like all other extraordinary remedies, is to be resorted to only in cases where the

usual and ordinary forms of remedy are insufficient and inadequate to afford redress."). Given the exceptional circumstances of this case, it is apparent that the remedies provided by W. Va.Code § 52–1–15 are not sufficient to provide the relief requested by Petitioner Stanley. The remedies provided by § 52–1–15 presuppose that the jury challenge will be limited to the procedures employed in a solitary case rather than a widespread challenge to the jury selection procedures employed in all cases, in all courts, within a particular circuit.

Furthermore, the dictates of judicial economy clearly gravitate in favor of deciding this matter as expeditiously as possible. It goes without saying that the far-reaching consequences of the propriety of the jury selection process in Berkeley County affects not only those cases prosecuted by Petitioner Stanley but also the entirety of all judicial proceedings currently pending in that circuit. Failure to resolve the instant controversy at this time would certainly necessitate further proceedings in these cases should we find Clerk Sine to have compromised the statutory juror selection process. In short, "[p]rohibition is a preventive remedy." Syl. pt. 5, in part, *State ex rel. City of Huntington v. Lombardo*, 149 W.Va. 671, 143 S.E.2d 535 (1965). *Cf.* Syl. pt. 1, *Town of Hawk's Nest v. County Court*, 55 W.Va. 689, 48 S.E. 205 (1904) ("Prohibition does not lie where the act complained of has been already done."). Thus, prohibition is an appropriate vehicle by which to consider and decide whether the current method of selecting prospective jurors in Berkeley County is proper and to prevent the perpetuation of improper juror selection practices should we so find. Having thus resolved this source of contention, we now shift our focus to the crux of the instant controversy, *i.e.*, whether selection of prospective jurors in sequential alphabetical order is proper.

The method by which prospective jurors are selected requires a random selection process.

It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all citizens have the opportunity in accordance with this article to be considered for jury service and an obligation to serve as jurors when summoned for that purpose.

W. Va.Code § 52–1–1 (1986) (Repl.Vol. 2000). *See also* W.Va.Code § 52–1–7(a) (1993) (Repl.Vol.2000) (directing that "[t]he chief judge of the circuit, or the judge in a single judge circuit, shall provide by order rules relating to the *random drawing* by the clerk of panels from the jury wheel or jury box for juries in the circuit and magistrate courts" (emphasis added)); W. Va. Code § 52–1–9(a) (1986) (Repl.Vol.2000) (requiring that "[t]he jurors drawn for jury service shall be assigned *at random* by the clerk to each jury panel in a manner prescribed by the court" (emphasis added)). In order to achieve this randomness, the Legislature has developed a detailed listing of the procedures circuit clerks are to follow when selecting prospective jurors. *See generally* W. Va.Code §§ 52–1–5 through 52–1–7a. At issue in this case is the composition of the jury box or the final grouping of prospective jurors from which the parties select the jury that will ultimately hear and decide their case.

W.Va.Code § 52–1–6 (1993) (Repl.Vol. 2000) specifies the manner in which prospective jurors are to be randomly selected. To achieve this end, § 52–1–6(c) establishes the key number system to ensure that prospective jurors for the jury box will be selected randomly:

The names or identifying numbers of prospective jurors to be placed in the jury wheel or jury box shall be selected by the clerk at random from the master list in the following manner: The total number of names on the master list shall be divided by the number of names to be placed in or added to the jury wheel or jury box and the whole number next greater than the quotient shall be the "key number", except that the key number shall never be less than two. A "starting number" for making the selection shall then be determined by a ran-

dom method from the numbers from one to the key number, both inclusive. The required number of names shall then be selected from the master list by taking in order the first name on the master list corresponding to the starting number and then successively the names appearing in the master list at intervals equal to the key number, recommencing if necessary at the start of the list until the required number of names has been selected. Upon recommencing at the start of the list, or if additional names are subsequently to be selected for the jury wheel or jury box, names previously selected from the master list shall be disregarded in selecting the additional names. The clerk is not required to, but may, use an electronic or mechanical system or device in carrying out its duties. (For example, assume a county with a master list of eight thousand nine hundred eighty names, a population of less than fifteen thousand and a desired jury box or wheel containing two hundred names. Eight thousand nine hundred eighty names divided by two hundred is forty-four and nine-tenths percent. The next whole number is forty-five. The clerk would take every forty-fifth name on the list, using a random starting number between one and forty-five.)

W. Va.Code § 52–1–6(c). The question now becomes whether this statutory provision also allows prospective jurors to be selected in sequential alphabetical order.

When examining language employed by the Legislature, we are constrained to read and consider precisely what was written by the legislative drafters. "We look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995). Accordingly, "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968). Ac-

cord Syl. pt. 1, *State v. Jarvis,* 199 W.Va. 635, 487 S.E.2d 293 (1997) (" 'A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951).").

From the statutory text recited above, it is clear that the plain language of W. Va. Code § 52–1–6(c) does not authorize a method of prospective juror selection other than the procedures delineated therein. " *'Inclusio unius est exclusio alterius,'* the expression that 'one is the exclusion of the others,' has force in this case. This doctrine informs courts to exclude from operation those items not included in the list of elements that are given effect expressly by statutory language." *State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 630 n. 11, 474 S.E.2d 554, 560 n. 11 (1996). Therefore, we hold that the jury selection procedures enumerated in W. Va.Code § 52–1–6(c) (1993) (Repl.Vol.2000) do not permit prospective jurors to be selected in sequential alphabetical order. To the extent that Clerk Sine has been selecting prospective jurors in this improper manner, we grant as moulded the requested writ of prohibition.

It has also been argued, however, that the presiding circuit judge possesses the ability to establish his/her own rules pertaining to the jury selection process with which the circuit clerk is then obligated to comply. For example, W. Va.Code § 52–1–7(a) instructs that "[t]he chief judge of the circuit, or the judge in a single judge circuit, shall provide by order [FN7] rules relating to the random drawing by the clerk of panels from the jury wheel or jury box for juries in the circuit and magistrate courts." (Footnote added). Likewise, W. Va.Code § 52–1–9(a) directs that "[t]he jurors drawn for jury service shall be assigned at random by the clerk to each jury panel in a manner prescribed by the court." *See also* W. Va.Code § 52–1–4 (1993) (Repl.Vol.2000) (indicating that the circuit clerk's selection of potential petit jurors shall be performed "under the su-

pervision of the circuit court ... or ... the chief judge of the circuit"); W. Va.Code § 52–1–6(a) (endowing circuit court with authority to direct manner in which circuit clerk maintains jury wheel or jury box). While these various statutory provisions do, indeed, afford a circuit judge such latitude, this discretionary power may not be exercised in such a way as to contravene the stated legislative purpose of ensuring randomness in the selection of prospective jurors. We repeatedly have observed in this Opinion that the solitary goal of the jury selection statutes is to ensure "that all persons selected for jury service be selected at random." W. Va.Code § 52–1–1. This goal of randomness is so fundamental to the American judicial system that it is not an ideal peculiar to the courts of this State but a process similarly recognized by the United States Supreme Court as an integral part of the federal court system as well. *See Taylor v. Louisiana,* 419 U.S. 522, 529, 95 S.Ct. 692, 697, 42 L.Ed.2d 690, 697 (1975) ("[T]he policy of the United States [is] that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." (internal quotations and citation omitted)).

FN7. In the case *sub judice,* the parties have indicated that the court's order directing Clerk Sine to select jurors in sequential alphabetical order was not reflected in writing. That portion of W. Va.Code § 52–1–7(a) (1993) (Repl.Vol. 2000) referencing such an order does not indicate whether the order must be written or whether an oral directive will suffice. As the resolution of this conundrum is not necessary to our decision of the issue before us, *i.e.,* jury selection through sequential alphabetical order, we will await a more factually appropriate case in which to address and resolve this query.

In light of the extreme importance of randomness and the role it plays in our judicial system, we simply cannot construe the jury selection statutes as permitting a circuit court judge to establish rules that contravene this purpose, no matter how innocent his/her intent may have been in adopting the same. Accordingly, we hold that a circuit court judge adopting rules governing the selection of prospective ju-

rors pursuant to W. Va.Code § 52–1–7(a) (1993) (Repl.Vol.2000) must comply with the public policy and stated requirements of the statutory jury selection procedures set forth in W. Va.Code § 52–1–1, *et seq.* Therefore, insofar as the circuit judge of Berkeley County has adopted rules directing Clerk Sine to select prospective jurors in sequential alphabetical order, we grant the requested prohibitory relief. Given that our decision herein involves a determination of a matter of first impression with far-reaching application to all jury trials previously had in Berkeley County since approximately 1998 and those jury trials currently pending in that county's courts, we conclude that the rulings we announce today should apply prospectively only. *See* Syl. pt. 5, *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979) (enumerating criteria court should consider when contemplating "whether to extend full retroactivity").

Finally, in closing we wish to address the catch–22 in which Clerk Sine found herself vis-a-vis the jury selection matters at issue herein. On the one hand, Clerk Sine is obligated to abide by the dictates of the circuit judge of the circuit for which she serves as clerk. We specifically have held that

[i]t was the intention of the framers of the judicial article (Article VIII) of the *W. Va. Const.* that the clerk of a circuit court, although an independently elected, public official, be subject to the direction and control of the circuit court of the county in which she serves or of the chief judge of that county's circuit court with regard to her court-related duties.

Syl. pt. 1, *Rutledge v. Workman,* 175 W.Va. 375, 332 S.E.2d 831 (1985). Although required to abide by the circuit judge's directive, Clerk Sine was likewise required to comply with the statutory requirements setting forth the proper procedure for jury selection. In this regard, W. Va.Code § 52–1–4 dictates that "[p]otential petit jurors shall be selected by the clerk of the circuit court *pursuant to the provisions of this article* and under the supervision of the circuit court, or in circuits with

more than one circuit judge, the chief judge of the circuit." (Emphasis added). We understand the predicament in which the Clerk found herself as she was simultaneously bound to follow the established statutory guidelines and obligated to comply with the circuit judge's jury selection rules. Furthermore, we appreciate the reasons underlying the judge's decision to implement this procedure for jury selection. Unfortunately, the method of jury selection heretofore followed in Berkeley County is not commensurate with the procedure established by the West Virginia Legislature to accomplish this end. Thus, to the extent to which the current jury selection process does not comport with the statutory requirements of W. Va.Code § 52–1–1, *et seq.*, we grant as moulded the requested writ.

*State v. Sine*, 215 W.Va. 100, 594 S.E.2d 314, 315–22 (2004).

[¶ 12] In an Arkansas case, *Henry v. State*, 29 Ark.App. 5, 775 S.W.2d 911, 915 (1989) the appellate court ruled:

The appellant also argues that the trial court erred in refusing to quash the jury panel because the jury was selected in violation of Ark.Code Ann. § 16–32–107 (1987). Subsection (b) states:

If the jurors are not present in court, the judge shall direct the sheriff to summon the number of jurors needed, the names of whom shall be taken from the jury book in the same order as they appear thereon, exempting those who have been excused from attendance.

The record reflects that there was a list of 152 persons in the jury book. Of the 152, approximately 50 had been excused. A list of 30 jurors was prepared by the judge and Dean Nelson, the Ashley County Circuit Clerk. According to Nelson, the list reflected the persons who had been present at a prior impaneling of the jury. The record also reflects that some of the potential jurors were not called because they had not returned questionnaires or had not been served. However, no reason was given for not calling many of the jurors except for the fact that they had not appeared at the prior impaneling.

In *Welch v. State*, 269 Ark. 208, 599 S.W.2d 717 (1980), the names of prospective jurors were selected at random, placed in alphabetical order, and placed on the jury wheel, and a smaller active jury panel was drawn. The appellant argued that putting this smaller list in alphabetical order and summoning the jurors in that order rather than in the order that they had been drawn from the wheel was in violation of Arkansas law. In affirming, the Supreme Court noted that no possibility of prejudice had been shown and that the names were put in alphabetical order for convenience rather than any sinister purpose. We find the same rationale in the present case: the trial court clearly was attempting to avoid the expense and time of calling jurors who had not bothered to respond to their call to duty. However, even though the appellants here have failed to demonstrate prejudice, we note that it is a better practice for trial courts to follow the method of jury selection prescribed in the Arkansas Jury Wheel Act. *See Hall v. State*, 259 Ark. 815, 537 S.W.2d 155 (1976).

[¶ 13] In the Georgia case, *Larmon v. State*, 256 Ga. 228, 345 S.E.2d 587, 588–90 (1986), it was determined:

We granted certiorari in *Larmon v. State*, 177 Ga.App. 763, 341 S.E.2d 237 (1986), to review the Court of Appeals' affirmance of the trial court's denial of the appellant's challenge to the array of the traverse jury. We affirm.

The appellant does not contend that the electronic selection process authorized by OCGA §§ 15–12–40(b), 15–12–42(b) per se violates the right to an impartial jury, but rather that the particular computer selection process then in use in the Superior Court of Whitfield County failed to randomly select the jury panels as required by law; did not "provide for a fair, impartial, and objective method of selecting persons for jury service," as required by OCGA § 15–12–42(b)(2)(A); and did not select the traverse jury from a fair cross section of the community. *Wilson v. State*, 250 Ga. 630, 635(3a), 300 S.E.2d 640 (1983).

"A defendant is entitled to an array of properly drawn, impartial jurors to which he may direct his peremptory challenges. A party is entitled to this as a matter of right; but, conversely, he is entitled to no more. [Cit.]" *Dampier v. State*, 245 Ga. 427, 433, 265 S.E.2d 565 (1980). "There is no constitutional guarantee that the grand or petit juries, impaneled in a particular case will constitute a representative cross-section of the entire community. "A defendant is not constitutionally entitled to a venire or jury roll of any particular composition ... [Cits.]' [Cit.]" What the Constitution does require is 'that the state not deliberately and systematically exclude identifiable and distinct groups from their jury lists.' [Cit.]" *Campbell v. State*, 240 Ga. 352, 356, 240 S.E.2d 828 (1977). " 'Criminal defendants in state courts may challenge discriminatory selections of grand and petit juries through the equal protection clause of the Fourteenth Amendment. [Cits.]' [Cit.] Moreover, criminal defendants in state courts have the right to challenge, under the Sixth Amendment, petit juries not selected from a fair cross section of the community. [Cit.] The two challenges are not entirely analogous. [Cits.] However, common to each is the requirement that the defendant must establish prima facie that a distinct and identifiable group in the community is substantially underrepresented on the jury venire being challenged." *Wilson v. State*, 250 Ga. 630, supra, 635(3a), 300 S.E.2d 640.

The appellant apparently makes no contention that the initial elements and stages of the jury selection process were not randomly neutral. His sole contention appears to be that the *ultimate* arrangement of the names of the selected jurors on the final computer print out contains: (a) alphabetical sequences, (b) a numerical sequence, and (c) geographical patterns.

(a) *Alphabetical sequences.* The computer print-out contained a number of blocks or sets of alphabetized jurors, which the appellant argues is inconsistent with a true random-selection process. However, the official jury list consists of an alphabetically-arranged computer print-out, OCGA § 15–12–43(b), and the system in question scanned the entire list, as required by OCGA § 15–12–40(b)(4). An employee of the company which originated this particular computer system testified that the fact of jurors' names being in alphabetical order or their residences being on the same street is "just at random" and "a coincidence." Furthermore, this sequence does not cause substantial underrepresentation of any "distinct and identifiable group in the community." *Wilson v. State*, 250 Ga. 630, supra, 635(3a), 300 S.E.2d 640.

(b) *Numerical sequence.* The jurors selected were listed on the final print-out according to their corresponding voter registration number, with the individual who had been assigned the lowest voter registration number being first on the computer print-out and the one with the highest number being last. The computer was not specifically programmed to *rearrange* the randomly selected jurors in this order. Rather, the master list from which the selections were made was itself arranged in sequential order of voter registration number. The computer was merely programmed to initiate its selection process from a randomly selected position in the master list and then to scan the entire length thereof, selecting jurors at regular intervals so as to ensure that individuals from all segments of the master list would be chosen. The arrangement of the names on the final print-out was purely the consequence of the fact that the computer was also programmed to list the jurors in order of their random selection from the master list.

The appellant argues that the system used results in jury lists which always begin with jurors who have lower voter registration numbers, hence are older. (The appellant was 24 years old at the time of his trial.) However, the county's Chief Registrar testified that the appellant's premise was not necessarily true, and that many persons with lower numbers are the same age or younger than those with higher numbers, which would include newer residents. There was also testimony that the voters list is alphabetically, not numerically, arranged, and that the registration

number is used in the computer merely for the purpose of accessing the computer files to update them. The programmer of the computer system in question testified that it was not feasible to set up the computerized jury list alphabetically because of the possibility of there being more than one juror with the same name. We agree with the Court of Appeals that the appellant failed to establish prima facie that those who were more recently registered voters and those who had been registered for a longer period were "distinct and identifiable" groups in the community. See generally *Berryhill v. State,* 249 Ga. 442, 445(3), 291 S.E.2d 685 (1982). Compare *Parks v. State,* 254 Ga. 403, 409(6b), 330 S.E.2d 686 (1985).

(c) *Geographical patterns.* The appellant maintains that the master jury list was composed in order of the various voter boxes in the county; therefore, he contends that this resulted in blocks or groups of jurors from the same geographical areas being put upon him on the panel. The significance of this, he argues, is that he was a white man being tried for the voluntary manslaughter of the black male lover of his black female ex-lover; that the black population of the county (who, he contends, would be more sympathetic with his lifestyle in this interracial love triangle) was concentrated mainly in one section of the City of Dalton; and that, because of this composition, he had to exhaust all of his peremptory challenges to eliminate jurors anticipated to be hostile to him (i.e., older, rural, and white residents).

The defendant had no constitutional guarantee that his jury would constitute a representative cross-section of the entire community, nor was he entitled to a venire or jury roll of any particular composition. *Campbell v. State,* 240 S.E.2d 828, supra, 356, 240 S.E.2d 828. Since the appellant does not contend that the original selection process was not randomly neutral, the mere fact that the names were originally obtained from geographical voting districts would not result in a non-random geographical pattern. There was no showing of a deliberate and systematic exclusion of identifiable and distinct groups, such as urban or black.

It is possible that a geographical arrangement could result in a list which is improperly constituted. The record in this case does not reveal such an effect. However, even though the jury list was not constitutionally infirm in this case, we note that it would be desirable if the list contained no alphabetical, geographical, or numerical patterns, and we strongly suggest that trial courts take steps to totally randomize the juror selection process.

What the appellant apparently seeks is for the computer to randomly print a list of names which are admitted to have been randomly selected already. In construing the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq., a federal court has held that "[i]t is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups ... Absolute or 'true' statistical randomness is thus not required for reasons of administrative feasibility. While an additional random selection might be better in terms of fairness to counsel trying a number of cases in a short period of time, by decreasing the chance that a given panel of jurors would remain as a group and meet the same attorney again, the lack of such an additional selection is not a deficiency in terms of ... the Constitution." *U.S. v. Haley,* 521 F.Supp. 290, 294 (N.D.Ga.1981). Since the appellant failed to establish a prima facie case of unconstitutional jury discrimination, the Court of Appeals did not err in affirming the trial court's denial of the appellant's challenge to the array of the traverse jury.

[¶ 14] In the case *United States v. Eyster,* 948 F.2d 1196, 1213 (11th Cir.1991), the appellate court held:

The appellants contend that the district court violated their Sixth Amendment right to trial before a jury drawn from a cross-section of the community by creating a venire of jurors with surnames that began with letters from only one portion of the alphabet. The district court qualified forty-eight jurors from which thirty-seven

potential jurors were selected as the panel from which the parties would strike. Lynn objected when the forty-eight had been called on the grounds "that the panel that has been selected for the jury venire was not done on a random basis." (R7:37). Eyster joined in the motion. The district court noted that the panel represented a fair cross-section of the panel called, and denied the motion. The jury was selected. Lynn later moved the district court to dismiss the indictment, stay the proceedings, or discharge the jury on the grounds that a venire composed of jurors with surnames beginning with letters A through J would overrepresent some ethnic groups while underrepresenting others. Eyster and Marshall joined in the motion. The district court again denied the motion.

We addressed this issue in *United States v. Puleo*, 817 F.2d 702 (11th Cir.), *cert. denied*, 484 U.S. 978, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987), in which the defendant claimed that her trial had been tainted because jurors with last names beginning with the letters M through Z were excluded from the jury. We held that "[w]hile we do not approve this practice, such an action does not systematically exclude a distinctive group of the community." *Id.* at 706; *see Walker v. Goldsmith*, 902 F.2d 16, 17 (9th Cir.1990) (persons with surnames W through Z found not to constitute a distinct class).

The appellants, recognizing our holding in *Puleo*, rely on the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1878 (1988), an issue not raised in *Puleo*. The Act requires a random selection of jurors from a representative sample. 28 U.S.C. §§ 1861, 1866(a). The appellants contend that an arrangement of names in alphabetical order violates the Act's mandate of random selection. The very same contention was brought in *United States v. Haley*, 521 F.Supp. 290 (N.D.Ga.1981). In *Haley*, the district court noted that the Act does not require true or absolute statistical randomness, and that it is sufficient " 'for the purpose of this legislation if the [jury selection] plan adopts some system of selection that affords no room for impermissible discrimination against individuals or

groups.' " *Id.* at 294 (quoting S.Rep. No. 891, 90th Cong., 1st Sess. 16, n. 9 (1967)). The district court held that the practice of selecting names in alphabetical order does not violate the Act. *Id.* We agree, although we restate our admonition discouraging the practice.

[¶ 15] In *Walker v. Goldsmith*, 902 F.2d 16, 16–17 (9th Cir.1990), the court held:

Petitioner, an Arizona state prisoner, appeals the district court's summary denial of habeas relief. Walker argues that his sixth amendment right to a jury that represents a fair cross section of the community and his fourteenth amendment right to equal protection were violated because the venire pool from which his trial jury was selected did not include those whose surnames began with the letters "W," "X," "Y," and "Z". Walker also argues that the venire system employed in his case violated Ariz.Rev.Stat. §§ 21–301A and 21–313. We affirm the district court's order because there is no evidence that surnames beginning with the letters W through Z constitute a cognizable and distinctive class within the community.

Walker was tried before a jury in the Arizona Superior Court for Pima County. He was convicted of aggravated assault and leaving the scene of an accident on September 30, 1983. He was sentenced to 10 years imprisonment. On May 1, 1987, Walker petitioned the Pima County Superior Court for post-conviction relief based on the failure to include those with surnames beginning with the letters W through Z in the venire from which his trial jury had been selected. Walker contended that this group constituted a recognizable and distinct class.[FN1]

---

FN1. Walker's contention that this group is a recognizable and distinct class is based on a survey by Dr. Trevor Weston. *See* Autry & Barker, *Academic Correlates of Alphabetical Order of Surname*, 8 J. Sch. Psychology 22, 22 (1970). Weston claims that those whose surnames begin with the letters S through Z are 50% more likely to develop a condition called "alphabetic neurosis" than are those whose surnames begin with the letters A through R.

The Pima County Superior Court refused to recognize that those with sur-

names beginning with the letters W through Z constitute a cognizable class. The court denied Walker's petition. The Arizona Court of Appeals denied his petition for review. After the Arizona Supreme Court denied certiorari, Walker petitioned for habeas relief in federal district court. The petition was summarily denied. We have jurisdiction under 28 U.S.C. § 2254. We review de novo a district court's denial of a habeas petition. *Jessup v. United States Parole Comm'n*, 889 F.2d 831, 834 (9th Cir.1989).

Walker must establish that those persons with surnames beginning with the letters W through Z are a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied," as a first step in establishing his claim that the Pima County venire system violated his right to equal protection. *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). He fails to do so.

A recognizable and distinct class for the purposes of jury selection is one "which, in some objectively discernible and significant way, is distinct from the rest of society, and whose interests cannot be adequately represented by other members of the ... jury panel." *United States v. Potter*, 552 F.2d 901, 904 (9th Cir.1977). Persons whose surnames begin with the letters W through Z do not constitute such a class in this case. *See United States v. Puleo*, 817 F.2d 702, 706 (11th Cir.) (persons whose surnames begin with the letters M through Z found not to constitute a distinct class), *cert. denied*, 484 U.S. 978, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987); *Krause v. Chartier*, 406 F.2d 898, 901 (1st Cir.1968) (no prejudice found to result from venire consisting entirely of persons with surnames beginning with the letters T through Z), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969).

[¶ 16] Finally, we take note that in *United States v. Puleo*, 817 F.2d 702, 706 (11th Cir.1987), the court held:

Puleo's contention that her trial was tainted because jurors with last names beginning with the letters M–Z were excluded from the jury is also without merit. While we do not approve this practice, such an action does not systemically exclude a distinctive group of the community. *See United States v. Blair*, 493 F.Supp. 398, 410 (D.Md.1980), *aff'd on other grounds*, 665 F.2d 500 (4th Cir.1981); *Krause v. Chartier*, 406 F.2d 898, 901 (1st Cir.1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969).

[¶ 17] In the instant case, Bloomer has failed to demonstrate that the method used by the district court clerk deprived him of a fair cross section of the community or that any distinctive group was systematically excluded from the jury panel. Thus, we conclude that the district court did not err as a matter of law in denying Bloomer's motion to quash the jury panel. As was the case with many of the appellate courts represented above, we do not approve of the method used because there are other more "tried and true" methods available that eliminate the concerns raised by the appeal. Wyo. Stat. Ann. § 1–11–129, does confer a degree of discretion to the district courts and the clerks of district courts in assembling jury panels. However, if the method chosen is not the one described in §§ 1–11–106 through 109, then the court and the clerk must be prepared to defend the "science" behind it. In this instance, the only apparent reason for choosing the method used was so as not to inconvenience jurors. We agree that the convenience of jurors is a laudable goal, but when it collides with the constitutional principles of Equal Protection, Due Process of Law and Trial by Jury, it must give way. As noted above, we do not approve of the method used to select the jury panel in this case, and it may not be used in any future cases. However, from the record on appeal before us, we are unable to conclude that the jury selected violated the crux of the random selection requirement, although it might not have been fully faithful to the spirit of that time-honored standard. To the extent its use was an improper deviation from what the governing statutes require, the error, if any, was harmless because we are unable to identify an irregularity that affected Bloomer's substantial rights. W.R.A.P. 9.04.

**District Court's Refusal to Consider Probation**

[¶ 18] Bloomer did not object at the time the district court made the offending remark, which we set out verbatim in our recitation of the facts and proceedings above. Therefore, we review this issue for plain error. To prove plain error, Bloomer must demonstrate: (1) that the record clearly reflects the alleged error, (2) that a clear and unequivocal rule of law was violated, and (3) that the violation adversely affected a substantial right of Bloomer's to his material prejudice. *Guinn v. State,* 2009 WY 15, ¶ 3, 201 P.3d 423 (Wyo.2009).

[¶ 19] With respect to the district court's obligation to consider probation we have held:

The district court's decision whether or not to grant probation in any given case is discretionary, and our review, therefore, is for the abuse of that discretion. *Trujillo v. State,* 2002 WY 56, ¶ 6, 44 P.3d 943, 945 (Wyo.2002) (quoting *Mower v. State,* 750 P.2d 679, 680 (Wyo.1988)). While the district court is not obligated to grant probation, it must consider an application for probation and, if such is not granted, include a statement in the written sentence expressly acknowledging that it considered the application. *Martinez,* 2002 WY 10, ¶ 10, 39 P.3d at 396; W.R.Cr.P. 32(c)(2)(D).

In making a determination as to whether probation is appropriate, the sentencing judge has discretion to frame and consider, in a reasonable manner, the relevant inquiries with respect to the recognized purposes for imposing sentence. *Robinson v. State,* 678 P.2d 374 (Wyo.1984). The societal need for retribution is a relevant consideration in the imposition of punishment. *Kavanaugh* [*v. State* ], 769 P.2d [908], 915 [(Wyo. 1989)]. Another appropriate consideration is whether the imposition of a penitentiary sentence would serve to deter others from committing similar crimes. *Volz v. State,* 707 P.2d 179 (Wyo.1985). It is appropriate to impose a sentence of imprisonment if probation would unduly depreciate the seriousness of the charged offense. *Volz,* 707 P.2d at 183.

*Whitfield v. State,* 781 P.2d 913, 916 (Wyo. 1989).

The appellant contends that the district court's refusal even to consider probation was evidenced by statements it made in rejecting the plea agreement, and by the following statement it made during the second sentencing hearing: "But I don't think the message can be sent to the public that there can be an aggravated homicide by vehicle with a .15 blood alcohol, going on the wrong side of the road, and not have a sentence of imprisonment imposed."

We will affirm the district court on this issue because we believe the appellant has mistaken that court's refusal to **grant** probation for a refusal to **consider** it. The district court's rationale for rejecting the plea agreement—the central focus of which was probation—was very similar to its later rationale for incarcerating the appellant. In both instances, the district court stated that, under the totality of the circumstances (high blood alcohol content, driving on the wrong side of the road, other near accidents, and a prior D.W.U.I.), probation would send the wrong message to the public.

Even taken out of context, the above-quoted statement of the district court does not say, "I would never grant probation in an aggravated vehicular homicide case." In context, the statement is simply one of many giving the court's reasoning for not granting probation in this case. In 'fact, the transcripts from the two hearings reveal the district court's struggle in deciding between "leniency"—meaning probation—and the "right" message. The facts of this case resemble those in which we previously have found a sufficient consideration of probation:

This court has stated that no particular amount of consideration of probation is required as long as the record reveals the district court did consider it. *Beaulieu v. State,* 608 P.2d 275, 275 (Wyo. 1980); see also *Volz v. State,* 707 P.2d 179, 182–83 (Wyo.1985). We applied this rationale in *Beaulieu* and held that, because a probation plan appeared in the presentence report and the defendant

requested probation at the sentencing hearing, sufficient evidence existed in the record to support the conclusion that the district court considered probation. 608 P.2d at 275. Similarly, in *Burk* [*v. State*, 848 P.2d 225 (Wyo.1993)], we found sufficient proof that the district court had considered probation when it imposed sentences in two cases against the defendant. 848 P.2d at 236. In the first case, the defense counsel argued for leniency and mentioned that other persons involved in the defendant's case had received probation. *Id.* In the second case, the defense counsel asked for leniency, the defendant's parents requested that the court grant probation, and the presentence investigation report addressed the issue of probation. *Id.*

*Martinez*, 2002 WY 10, ¶ 11, 39 P.3d at 396.

*Cohee v. State*, 2005 WY 50, ¶¶ 15–18, 110 P.3d 267, 272–73 (Wyo.2005); also see *Monjaras v. State*, 2006 WY 71, ¶ 11, 136 P.3d 162, 164–65 (Wyo.2006).

[¶ 20] In this instance, the district court's comment is more troubling than in some of the many cases cited immediately above because it does suggest that probation would not be considered if Bloomer opted for a trial. However, we must measure the impropriety of the statement in the context of the entirety of the record on appeal. There was ample time between the hearing on Bloomer's request to vacate his jury trial date and enter a plea of guilty and the district court's offending comment, for the district court to reconsider what was likely a "spur of the moment" reaction to Bloomer's continued efforts to frustrate the orderly progress of his case. At sentencing the district court explicitly indicated that it could not consider probation given Bloomer's offenses. In the sentencing order, the district court considered the advisability of probation and rejected it as an option in sentencing. The presentence report indicated that due to Bloomer's extensive criminal history, "a term of probation cannot be recommended."

[¶ 21] The record clearly reflects the asserted error and that a clear and unequivocal rule of law was violated. However, we are unable to conclude, in light of the entire record with respect to this matter, that the violation adversely affected a substantial right of Bloomer's to his material prejudice. Compare *Guinn*, 201 P.3d at 423. The district court clearly considered probation at sentencing despite his unfortunate remarks earlier in the proceedings.

### CONCLUSION

[¶ 22] The judgment and sentence of the district court is affirmed.

HILL, J., delivers the opinion of the Court; VOIGT, C.J., files a dissenting opinion, with whom BURKE, J. joins in part; BURKE, J. files a separate dissenting opinion.

VOIGT, Chief Justice, concurring in part and dissenting in part, in which BURKE, Justice, joins in part.

[¶ 23] I concur with the majority's resolution of the jury panel issue, but I would reverse on the second issue. I believe the facts of this case are barely distinguishable from those in *Guinn v. State*, 2009 WY 15, ¶ 7, 201 P.3d 423, 424 (Wyo.2009), where we reversed a conviction because "the record certainly leaves open the possibility that the district court's sentencing decision was based in part upon" the appellant's exercise of his right to trial by jury. The present facts may be even more egregious. In *Guinn*, the judge merely said he believed it was appropriate in sentencing to consider that the appellant had not pled guilty. *Id.* at ¶ 5, 201 P.3d at 424. Here, the judge openly avowed that a jury trial conviction would result in "no request for any type of probation."

BURKE, Justice, dissenting.

[¶ 24] I join Chief Justice Voigt's dissent, but write separately because I disagree with the majority's resolution of the jury panel issue. The question presented is simple: Did the jury selection process comply with the Wyoming statutory requirements? To answer that question, I would interpret and apply the applicable Wyoming statutes. *See State v. Curtis*, 2002 WY 120, ¶¶ 23–26, 51 P.3d 867, 872 (Wyo.2002) (Golden, J., dissent-

ing). Because these statutes are clear and unambiguous, it is unnecessary to rely on constitutional principles or decisions from other jurisdictions with different jury selection statutes.

[¶ 25] Under Wyoming's statutory process, a list of persons qualified to serve as jurors is certified to the clerk of court as "the base jury list for the district court ... from April 1 of the year in which the list is certified and delivered through March 31 of the following year." Wyo. Stat. Ann. § 1–11–106(a) (LexisNexis 2007). The clerk of court prepares ballots using all of the names on the base jury list, and places the ballots "in a box known as and plainly marked 'jury box number one.'" Id. When a jury trial approaches on the docket, the district court directs the clerk to draw a specified number of names from "jury box number one." Id. Before drawing those names:

> The clerk shall shake the box containing the names of the regular jurors so as to mix the ballots therein as well as possible. He shall then draw from the box as many ballots as are ordered by the court.

Wyo. Stat. Ann. § 1–11–109(a). Persons whose names are drawn from "jury box number one" become members of the jury panel, and they are summoned to appear at the specified time and place for jury selection. Wyo. Stat. Ann. § 1–11–109(d) and (e).

[¶ 26] In Mr. Bloomer's case, the base jury list consisted of 350 persons, listed in alphabetical order. The clerk of court did not put all 350 names in a box, shake them, and draw names for the jury panel. Instead, she limited the potential jurors to those on the base jury list whose last names began with the letters "H" through "P."

[¶ 27] The clerk's failure to draw the names from "jury box number one" is not, by itself, fatally defective. Wyo. Stat. Ann. § 1–11–129 expressly allows alternative methods for the drawing of jurors, but it explicitly specifies that the alternative methods must be "calculated to insure the integrity of the system and *a random selection process.*" Id. (Emphasis added.) The word random is

defined as "having the same probability of occurring as every other member of a set." *Webster's Third New International Dictionary* 1880 (2002).

[¶ 28] The procedures specified by statute insure a random selection process. The set of 350 names on the base jury list is placed into "jury box number one." When the clerk draws names, every person in the set has an equal probability of being selected for the jury panel.

[¶ 29] The procedures used to select the jury panel in Mr. Bloomer's case did not result in a random selection from the set of 350 jurors on the base jury list. Only those whose last names began with letters "H" through "P" had the potential to be selected as jurors. Those whose last names began with the letters "A" through "G" and "Q" through "Z" had no probability of being selected. Because every person on the base jury list did not have an equal probability of being selected, the selection process was not random, and did not comply with the statutory requirements.

[¶ 30] I am perplexed by the majority's failure to grant relief to Mr. Bloomer in light of its determination that this method "may not be used in any future cases." Such determination prompts the question, "Why not?" Is the majority finding that the procedure failed to comply with the statute? The opinion does not specifically make that finding. Will this Court apply a harmless error analysis to future violations? If so, as Mr. Bloomer has discovered, the Court's mandate is essentially meaningless. Future litigants will find themselves in the same position as Mr. Bloomer. A trial court's failure to satisfy jury selection requirements will remain a wrong without a remedy.

[¶ 31] If the Court is not going to apply a harmless error analysis in future cases, it should not apply that analysis here. Mr. Bloomer raised this issue prior to trial. He established that the procedure did not comply with the statutorily mandated random jury selection process. If any litigant is enti-

tled to relief, it is Mr. Bloomer.[2] I would reverse.

**2.** *See, e.g., Oroz v. Board of County Com'rs of Carbon County*, 575 P.2d 1155, 1159 (Wyo.1978):

The final question herein is the application of this decision. The court is fully cognizant that a long reliance has been placed upon the rule of immunity and that it will raise certain problems which must be considered and proper arrangements made.... However, this appellant should not be the recipient of a pyrrhic victory but should be allowed to proceed. There is abundant authority as to the propriety of this approach. There are at least three reasons given for this result: Unless it is applied to the appealing party the decision is mere dicta; refusal would deprive the successful appellant of the fruits of his time, effort and expense; and further that the plaintiff should have recovery for the reason that case law is not likely to keep up with the needs of society if the litigant who successfully champions a cause is left with only that distinction.
(Internal citations and punctuation omitted.)